IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| STEVEN ISAAC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:24-cv-1208 (LMB/WEF) |
| | ) |
| MIDDLE EAST BROADCASTING | ) |
| NETWORKS, INC., | ) |
| | ) |
| Defendant. | |

MEMORANDUM OPINION

Plaintiff Steven Isaac ("plaintiff" or "Isaac"), an Iraqi American, has filed a one-count Complaint against his former employer, defendant Middle East Broadcasting Networks, Inc. ("defendant" or "MBN"), alleging that defendant's decision to terminate his employment was based on national origin discrimination. Defendant has filed a Motion to Dismiss the Complaint for failure to state a claim. [Dkt. No. 7] ("Motion"). The Motion has been fully briefed and argued, and for the reasons that follow, it will be granted.

I. BACKGROUND

Defendant is a Virginia-based company providing Arabic-language news and information via satellite television, radio, and digital platforms to the Middle East and North Africa. Compl. ¶ 7; see also [Dkt. No. 8] at 2.[1] Plaintiff, an Iraqi American, was a correspondent employed by

---

[1] The Complaint does not specify the geographic regions that MBN targets, but defendant provides that information in its Motion and plaintiff has not objected or alleged contrary facts. The Court also takes judicial notice of MBN's website, which states that "MBN is an Arabic-language multimedia organization that reaches 34.1 million people in the Middle East and North Africa (MENA) weekly." See https://www.usagm.gov/networks/mbn/ (last visited December 4, 2024).

defendant, first as a contractor beginning in May 2018, then as an at-will W-2 employee from March 10, 2020 through his termination on September 2, 2022. Compl. ¶¶ 2, 4–5. Plaintiff made his Iraqi American status openly known to coworkers, including defendant. Id. ¶¶ 12–13. When he was terminated, plaintiff's immediate supervisor was Kalyl Lubad ("Lubad"), and MBN's Acting President was Hassan Shwiki ("Shwiki"). Id. ¶¶ 15–16.

All MBN journalists[2] are bound by MBN's Journalistic Code of Ethics ("Code"). Id. ¶ 21. Enforcement of the Code "ha[d] been coming from MBN's office of the president." Id. ¶ 29. The Code, attached to the Complaint as an exhibit, states that "MBN does not, explicitly or implicitly, endorse or advocate any specific political, economic, or religious viewpoint. No report broadcast or published by MBN should do so." [Dkt. No. 1-2] at 1. In a section entitled "Prohibition of Personal Opinion/Analysis and Commentary," the Code states that "MBN's Journalists should not insert their personal opinions in any report on any platform at any time and should not provide Commentary."[3] Id. at 2–3. The "Social Media" section of the Code states that "MBN's Journalists should not write or repeat anything on any social media site that MBN could not defend as a news organization." Id. at 5. The subsection for "Personal Accounts" states that the "[Code] applies to all personal social media accounts of all MBN Journalists," and that "inflammatory or otherwise inappropriate material from third parties must be deleted immediately." Id. at 6. Finally, the Code states that "[v]iolations of this policy may result in disciplinary action, up to and including termination of employment." Id. at 7.

---

[2] The Complaint uses the term "journalists" to describe all reporters, investigative journalists, anchors, correspondents, and others who work at MBN because all are allegedly bound by the same Code of Ethics. Compl. ¶ 24. This is consistent with the language in the Code, which defines journalist as "those individuals who assign, write, report, edit, post, produce and broadcast news on any of MBN's platforms." [Dkt. No. 1-2] at 1.

[3] "Commentary" is defined as "analytical in content and judicious in tone but reflects the personal judgment or opinion of the speaker on a particular issue." [Dkt. No. 1-2] at 3.

The Complaint alleges that MBN "used its Code as a pretext to terminate Iraqi Journalists" while not terminating non-Iraqi journalists who "post[ed] much more inflammatory and aggressively in violation of the Code." Compl. ¶¶ 39–44, 76. As examples, the Complaint describes Algerian-born correspondent Khalil Bin Tawila appearing "with his title in a TV interview [on] a Radical Anti-government Chinese network and call[ing] for regime change. He was suspended for two weeks and not let go." Id. ¶¶ 41–42. The Complaint also points to non-Iraqi journalists Pedro Ghanem, Joe Khawly ("Khawly"), and Tamara Abou Dehen ("Dehen"), who "frequently tweet their political opinions without reprimand from MBN." Id. ¶ 59. Khawly, who is Lebanese, "repeatedly called out his guest Neil Strauss who appeared with him on MBN's Al-Hurra on his Instagram account, saying Mr. Strauss was not factual and that Mr. Khawly stands against lies and hypocrisy." Id. ¶ 66. "Khawly has also been attacking Christians and calling out 'Christian Extremists' in many tweets and posts on his social media platforms, including in a tweet from April 2023. On March 4 he retweeted a tweet calling a Christian preacher a 'piece of shit.'" Id. ¶ 67.[4] Dehen "has regularly stated her strong opinions against the government of Lebanon and even called the political system 'corrupt.'" Id. ¶ 71.

The Complaint alleges that "[t]hroughout his employment with MBN, plaintiff had only positive performance assessments and never received any verbal or written reprimands," id. ¶¶ 18–19; however, beginning in early March 2021, "MBN gave multiple Iraqi Journalists"—including plaintiff, Maan Habib ("Habib"), Saad Nasser, and Omar Al-Hamdani—"verbal warnings to stop posting any political content about Iraq on their personal social media accounts." Id. ¶¶ 32–33. On September 2, 2022, "without prior warning," plaintiff was

---

[4] In March 2023, Khawly also tweeted critiques of United States Representative Lauren Boebert and Florida Governor Ron DeSantis. Id. ¶¶ 68–69.

3

informed at a meeting with the "Advisor to MBN['s] President" and the "Head of News" that "MBN [was] terminating his employment" "due to a tweet in violation of MBN's social media policy." Id. ¶ 37. Plaintiff was not told what the tweet was nor given an opportunity to address MBN's concern. Id. ¶¶ 38, 73. Habib was also terminated in September 2022. Id. 73.

On February 28, 2023, plaintiff filed an EEOC complaint, alleging that he was the victim of national origin discrimination. Id. ¶ 11. On April 11, 2024, the EEOC dismissed plaintiff's complaint and issued a notice of right to sue. Id. Plaintiff timely filed the instant Complaint. Id. Plaintiff seeks "back pay and front pay;" compensatory and punitive damages; an order prohibiting defendant "from continuing to maintain its illegal policy, practice or custom;" attorneys' fees; and other relief. Id. ¶ 57.

## II. ANALYSIS

### A. Standard of Review

In considering a Rule 12(b)(6) motion, a court must construe the complaint in the light most favorable to the plaintiff, and take the facts asserted in the complaint as true. Mylan Lab., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). Rule 12(b)(6) requires that a complaint be dismissed when it does not "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To survive a motion to dismiss, a complaint must allege enough facts "to raise a right to relief above the speculative level." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Twombly, 550 U.S. at 555). "Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." Id. (quoting Iqbal, 556 U.S. at 679).

4

## B. National Origin Discrimination Under Title VII

Contrary to defendant's erroneous argument, [Dkt. No. 8] at 9, in the context of a Title VII case, "an employment discrimination plaintiff need not plead a prima facie case of discrimination" to survive a motion to dismiss. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 515 (2002); see also Barbour v. Garland, 105 F.4th 579, 590 (4th Cir. 2024) ("[A] Title VII [] claim may survive a motion to dismiss under [Rule] 12(b)(6) even if the complaint does not allege facts sufficient to establish the McDonnell Douglas framework's prima facie case."). Instead, "[t]o state a claim for unlawful termination, a Title VII plaintiff must allege facts sufficient to raise a plausible inference that his employer discharged him because of his [national origin]." Holloway v. Maryland, 32 F.4th 293, 299 (4th Cir. 2022) (citing 42 U.S.C. § 2000e-2(a)(1)). The Complaint at issue does not allege direct discrimination;[5] rather, it alleges circumstantial evidence of discrimination by comparing plaintiff's treatment with that of other employees outside his protected class. Accordingly, the Complaint must plead sufficient facts to allege a plausible claim of differential treatment based on national origin.

In its Motion to Dismiss, defendant focuses on the Complaint's failure to plead sufficient comparators. "A plaintiff is not required to identify a similarly situated [] comparator to prove [his] discrimination claim;" however, "[w]here a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination, [] '[t]he similarity between comparators . . . must be clearly established in order to be meaningful.'" Swaso v. Onslow Cnty. Bd. of Educ., 698 Fed. Appx. 745, 748 (4th Cir. 2017)

---

[5] In his opposition to defendant's Motion, plaintiff argues that "the facts of this case lend itself [sic] to direct discrimination as well," but this argument is both without support in the Complaint and presented incoherently. See [Dkt. No. 10] at 9–10 ("Plaintiffs [sic] evidence of the pre-textual [sic] basis being meritless, the targeted nature of it against other Iraqi journalists show conduct to directly discriminate against the Iraqi-journalists [sic].").

(quoting Lightner v. City of Wilmington, N.C., 545 F.3d 260, 265 (4th Cir. 2008)). "Overall, the [comparator] inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that . . . would allow [] an inference of discrimination." Eaton v. Ind. Dep't of Corr., 657 F.3d 551, 556 (7th Cir. 2011) (internal quotation marks and citations omitted). "This generally requires the plaintiff to [allege] that the comparator had the same supervisor, was subject to the same employment standards, and had engaged in conduct similar to that of the plaintiff," id., but "evidentiary determinations regarding whether the comparators' features are sufficiently similar to constitute appropriate comparisons generally should not be made at" the motion to dismiss stage. Woods v. City of Greensboro, 855 F.3d 639, 650 (4th Cir. 2017). Courts instead look for alleged "facts sufficient to raise a plausible inference that [plaintiff's] employer discharged him because of his race." Holloway, 32 F.4th at 299.

### C. Comparator Analysis

Defendant argues that the Complaint fails to allege a "legally-adequate [sic] comparator." [Dkt. No. 8] at 6. The comparators alleged in the Complaint include two non-Iraqi MBN investigative reporters, Randa Jebai and Ghalia Bdwei, Compl. ¶ 47; two non-Iraqi news anchors, Khawly and Dehen, id. ¶ 61; a non-Iraqi reporter, Ghanem, id. ¶ 62; an Algerian correspondent, Tawila, id. ¶ 41; and all other non-Iraqi journalists, id. ¶ 40.

#### 1. Job Titles and Employment Standards

Except for Tawila, each named comparator has a different job title than plaintiff. Although defendant argues that the differences in job titles are relevant because job title is a significant factor under the usual test for comparators, the job feature most relevant to plaintiff's national origin discrimination claim is whether the comparators were also subject to the Code. The Complaint states that all journalists were subject to the Code, but that the Code was

6

inconsistently applied to Iraqi and non-Iraqi journalists. Because the Code states that it applies to all journalists—a term the Code also defines broadly to encompass the comparators' job titles—the Complaint adequately alleges that each position is equally subject to the Code, which makes the differences in job titles minimally relevant for purposes of plaintiff's national origin discrimination claim.

2. Supervisors

Defendant argues that, except for Tawila, each named comparator had a different immediate supervisor than plaintiff. The Complaint alleges that the difference in supervisors is irrelevant because the Acting President of MBN, Shwiki—and not lower-level supervisors—was supervising both plaintiff and the comparators for purposes of enforcing the Code. Compl. ¶¶ 29–31; [Dkt. No. 10] at 4, 6. Defendant contends that pleading such "limitless commonality" among all employees at MBN—all of whom are subordinate to MBN's President—improperly contravenes the "same supervisor" element of the comparator analysis. Motion at 15 (citing Bagwell v. Downtown P'ship of Balt., Inc., No. 18-cv-1786-ELH, 2020 WL 247293, at *9 (D. Md. Jan. 15, 2020) ("Title VII does not permit such generalized comparisons.")). In Bagwell, the plaintiff argued that the CEO of her organization was the relevant supervisor because both she and the alleged comparator ultimately reported to the CEO; however, the plaintiff failed to produce evidence at the summary judgment stage that the CEO meaningfully oversaw the plaintiff's or the comparator's work. 2020 WL 247293, at *9. Bagwell is of little significance to the instant Motion because it neither analyzed comparators at the motion to dismiss stage[6] nor

---

[6] See generally Bagwell v. Downtown Partn. of Balt., Inc., No. 18-cv-1786, 2018 WL 5885525 (D. Md. Nov. 8, 2018) (analyzing the defendant's partial motion to dismiss without addressing comparators or supervisors).

involved specific allegations or evidence that a president (or CEO) actively supervised the plaintiff or the comparators.

Although the supervisor factor generally requires a common immediate supervisor, at this stage the Complaint adequately alleges that plaintiff's immediate supervisor had nothing to do with his termination, and that Shwiki's office was responsible both for enforcing the Code generally at MBN and for plaintiff's termination. Compl. ¶ 29–31. The Complaint alleges that staff from the Acting President's office were present when plaintiff was terminated and that his immediate supervisor, Lubad, expressly denied involvement. These alleged facts give rise to the plausible inference that Shwiki or his staff were overseeing Code compliance at MBN. Accordingly, treating Shwiki as the comparators' common supervisor is appropriate at this stage of the litigation.

  3. <u>Conduct</u>

Defendant's last argument—that the Complaint fails to allege that the comparators engaged in the same conduct as plaintiff—is persuasive. As a threshold matter, the Complaint concedes that plaintiff was a W-2 employee, which means he was an at-will employee and could be terminated at any time for any or no reason, except for discriminatory reasons in violation of Title VII. The Complaint alleges that plaintiff was terminated for social media postings that MBN concluded violated the Code without being told what the postings were or how they violated the Code. As an at-will employee, being fired without explanation does not amount to a Title VII violation. To overcome this hurdle, the Complaint alleges that anti-Iraqi animus motivated the termination and points to MBN's inconsistent treatment of non-Iraqi journalists who posted statements that allegedly violated the Code. The problem with this conclusory statement is that it is unsupported by the factual allegations in the Complaint.

As for the comparators whose social media postings are attached to the Complaint, defendant argues that these "miscellaneous tweets that [plaintiff] culled" from the comparators' social media pages cannot save the Complaint because the Complaint does not allege "that MBN ever became aware of these tweets, or raised concerns about them, as was the case with Plaintiff's tweets." [Dkt. No. 8] at 18. Plaintiff does not respond to this argument in his opposition. As defendant observes, the Complaint is devoid of allegations that MBN was aware of the comparators' postings. Moreover, the Court need not accept as true the Complaint's conclusory statements that plaintiff's postings and those of the other Iraqi journalists did not violate the Code. Rather, the Complaint must allege facts raising plaintiff's right to relief above a plausible level. Specifically, the Complaint has failed to allege facts supporting plaintiff's claim that he engaged in conduct similar to that of his comparators. Although he describes postings by his comparators that he characterized as violating defendant's Code, he did not include his postings.

Because this Court did not have sufficient information to resolve this Motion, defendant was ordered to produce the postings that were the basis for its decision to terminate plaintiff's employment. [Dkt. No. 15]. On November 1, 2024, defendant provided a declaration by Hassan Shwiki, who was defendant's acting president when plaintiff was fired. [Dkt. No. 17]. Attached to that declaration were four of plaintiff's Twitter postings: one undated, one dated August 28, 2022, and two dated August 29, 2022—all directed specifically at internal Iraqi political figures, making critical statements about them. As such, with the exception of the description of a posting by comparator Dehen, who the Complaint alleges "has regularly stated her strong opinions against the government of Lebanon and even called the political system 'corrupt,'"

none of the other comparators' postings involved criticism of events in Middle Eastern countries, and none were directed at Iraq.

Although the Shwiki declaration provides compelling context for defendant's warning Iraqi journalists to "stop posting political content about Iraq on their personal social media accounts," Compl. ¶¶ 32–33, and for terminating plaintiff's employment, the Court cannot consider that declaration at the motion to dismiss stage. Even without that declaration, the Court finds that the Complaint, as drafted, by not including the postings for which plaintiff was fired, fails to make out a plausible claim that plaintiff was terminated due to his national origin. With the benefit of the postings at issue, it appears that plaintiff's postings violated a specific policy that had been in place since early March 2021. See id. ¶¶ 18–19. For these reasons, defendant's Motion to Dismiss will be granted by an order that will dismiss this Complaint, initially without prejudice, to enable plaintiff to file an amended complaint, if he can do so without violating Fed. R. Civ. P. 11. Plaintiff's counsel should carefully consider the Shwiki declaration before refiling because, unless there are non-Iraqi comparators who violated defendant's policy prohibiting posting political content about Iraq on their personal social media accounts, and were not fired, there would appear to be no legitimate basis upon which to file an amended complaint alleging national origin discrimination.[7]

---

[7] Plaintiff's counsel filed a nearly identical national origin discrimination complaint against defendant on behalf of another Iraqi American journalist, Maan Aljizzani, who was also fired for violating defendant's Code. See Aljizzani v. Middle E. Broad. Networks, Inc., No. 22-cv-1321, 2024 WL 3092404, at *6 (E.D. Va. June 20, 2024), appeal docketed, No. 24-1672 (4th Cir. July 22, 2024). In contrast with this Complaint, Aljizzani's posting was cited in the amended complaint, but the alleged comparators' postings were not. Highly relevant to this civil action is that defendant allegedly interpreted Aljizzani's posting to be criticizing a political leader in Iraq, the Grand Ayatollah Ali al-Sistani, which interpretation appears to have been quite reasonable in context. See 2024 WL 3092404, at *1; see also [Dkt. No. 8-1] ¶¶ 31–33, 39–40. The complaint, after being amended, was dismissed, and that decision is on appeal.

## III. CONCLUSION

For all the reasons stated above, defendant's Motion to Dismiss Plaintiff's Complaint, [Dkt. No. 7], will be granted by an Order that will accompany this Memorandum Opinion.

Entered this 4th day of December, 2024.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

11